FILED

2008 Sep-30  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| E M C A S C O   I N S U R A N C E COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-07-S-0375-NE |
| | ) | |
| KIM HOPE and STEVE HOPE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This action arises from the cancellation of a homeowner's policy by plaintiff, EMCASCO Insurance Company ("EMCASCO"), five days before a fire destroyed the dwelling, detached garage, and personal property of its insureds, defendants Kim and Steve Hope ("the Hopes"). EMCASCO is an Iowa corporation, the Hopes are residents of Alabama, and the jurisdiction of this court is based upon the diversity jurisdiction statute, 28 U.S.C. § 1332(a)(1). Accordingly, under the *Erie* doctrine, the court must apply state substantive law and federal procedural and evidentiary rules. *See, e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494-45 (11th Cir. 1982); *Johnson v. William C. Ellis & Sons Works, Inc.*, 609 F.2d 820 (5th Cir. 1980) (holding that, "in diversity cases, the

Federal Rules of Evidence govern the admissibility of evidence in the federal courts").

EMCASCO seeks a judgment declaring that it is not obligated to indemnify the Hopes for their loss.[1]  The Hopes filed counterclaims alleging that EMCASCO breached the insurance contract between the parties, and that EMCASCO acted in bad faith by refusing to indemnify them for their loss.[2]  The action now is before the court on cross motions for summary judgment.  Upon consideration of the motions, the parties' briefs, and the evidentiary submissions, the court concludes that EMCASCO's motion for summary judgment is due to be granted, and the Hopes' motion is denied.

## I. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 7 (Counterclaim) and doc. no. 12 (Amended Counterclaim).

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Likewise, "summary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party' [if the case proceeded to trial]." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251 (1986) (internal citations omitted).

In either situation, the relevant question is whether the admissible evidence on file "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  *See also Anderson*, 477 U.S. at 251-52 (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Because cross motions for summary judgment are presented, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, *Federal Practice and Procedure:  Civil 3d* § 2720, at 335-36 (1998) (footnote omitted). *See also*, *e.g.*, *Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986).  Further, the court is required to "relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment." *Serrano-Cruz v. DFI Puerto Rico*, *Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

## II. FACTS

On July 27, 2006, the Hopes entered into a "land contract" with Angie and Kerry Vaughn to "purchase" a dwelling, detached garage, and eight acres located at 984 County Road 195 in Danville, Alabama ("the subject property").[3]  At that time, the subject property was in foreclosure proceedings initiated by the Vaughns' mortgagee, Traders and Farmers Bank of Arley, Alabama.[4]  The "land contract" stated that the total sale price of the property was "pay off of 1st and 2nd mtgs." and that the total balance to be financed was "pay off."[5]  The land contract

---

[3] *See* doc. no. 19, Exhibit B (Land Contract).

[4] *See* doc. no. 18, Statement of Undisputed Facts, ¶ 2.

[5] *See* doc. no. 19, Exhibit B.

provided that the Hopes would make a $2,000 down payment and "6 payments over a 1/2 year period, at $860.00 . . . beginning on [August 20, 2006], with a final payment coming due and payable on or before [February 1, 2007] with a renewable option."[6]  In effect, the Hopes were to pay down the Vaughns' mortgage debt for six months, and then attempt to obtain financing to acquire legal title to the subject property.

On August 8, 2006, twelve days after the Hopes and the Vaughns entered into the "land contract," they executed another agreement providing that:

> WE, THE UNDERSIGNED, KERRY VAUGHN AND ANGIE VAUGHN AND STEVE HOPE AND KIM HOPE DO HEREBY ACKNOWLEDGE THAT WE HAVE ENTERED INTO A LAND CONTRACT DATED JULY 27, 2006.
>
> WE, THE UNDERSIGNED, DO HEARBY ACKNOWLEDGE AND AGREE THAT SAID LAND CONTRACT DATED JULY 27, 2006 DOES NOT AFFECT THE MORTGAGE WHICH IS HELD BY TRADERS AND FARMERS BANK IN THE NAME OF KERRY AND ANGIE VAUGHN ON THE NAME REAL ESTATE WHICH IS BEING SOLD ON THE LAND CONTRACT.
>
> WE, THE UNDERSIGNED, FURTHER ACKNOWLEDGE AND AGREE THAT SAID LAND CONTRACT DOES NOT PROHIBIT TRADERS AND FARMERS BANK FROM FORECLOSING ON THE REAL ESTATE WHICH IS BEING SOLD ON THE LAND CONTRACT DATED JULY 27, 2006 AND ON WHICH TRADERS AND FARMERS BANK HOLDS AS COLLATERAL ON A MORTGAGE IN THE SAME OF KERRY AND ANGIE VAUGHN IN THE EVENT THAT PAYMENTS ON SAID MORTGAGE SHOULD BECOME PAST DUE.

---

[6] *Id.*

> WE, THE UNDERSIGNED, FURTHER ACKNOWLEDGE AND AGREE THAT TRADERS AND FARMERS BANK *IS NOT* A PARTY IN ANY WAY TO THE LAND CONTRACT DATED JULY 27, 2006 WHICH IS SIGNED BY KERRY VAUGHN AND STEVE HOPE AND KIM HOPE.[7]

In accordance with this agreement, title to subject property remained in the Vaughns' names at all times relevant to this action, and the Hopes never received a deed.[8]

In early September of 2006, shortly after the Hopes moved onto the subject property (and occupied the dwelling situated on that property), they contacted Jud Keel, an independent insurance agent, for the purpose of obtaining "homeowner's" insurance coverage on the dwelling, detached garage, and their personal property.[9] Keel conducted a physical inspection of the subject property on September 11, 2006 and completed an application for an EMCASCO homeowner's policy.[10]  On the application, Keel checked a box indicating that the dwelling to be insured was occupied *by the owners*.[11]  Keel contends that "the Hopes specifically informed [him] that *they were the owners* of the subject property."[12]  On the other hand, the

---

[7] *See id*., Exhibit D (emphasis original).  The original document omits the name of Angie Vaughn in the final paragraph.

[8] *See* doc. no. 19, Statement of Undisputed Facts, ¶ 6.

[9] *See* doc. no. 18, Statement of Undisputed Facts, ¶¶ 6 and 7.

[10] *See* doc. no. 19, Exhibit G (EMCASCO Application).

[11] *Id*.

[12] *See* doc. no. 22, Exhibit C (Affidavit of Jud Keel), ¶ 6 (emphasis supplied).

Hopes contend that Keel had actual knowledge of the circumstances of the land-sale contract, including the fact that title to the property was not in their names.[13]

EMCASCO subsequently issued a homeowners' policy to the Hopes, with an effective date of September 11, 2006, and an expiration date of September 11th of the following year.[14]   EMCASCO asserts that, on the date of issuing that policy, it was not aware of the fact that the Hopes lacked title to — and, therefore, were not the legal owners of — the subject property.[15]   The annual premium for the homeowners policy was $959.00 (or $79.92 a month).[16]   On September 11, 2006, the effective date of the insurance policy, the Hopes made an initial premium payment in the amount of $159.83, representing two monthly premiums (*i.e.*, 79.92 x 2 = 159.83).   The balance of the premium due for the first year of coverage was to be billed to and paid by the Hopes over ten months.[17]   Significantly, the policy included the following language addressing EMCASCO's right to cancel coverage, in the event the Hopes failed to pay the balance of the premium due:

> We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect.   This cancellation notice may be delivered to you, or mailed to you at your

---

[13] *See* doc. no. 30, Statement of Undisputed Facts, ¶ 14.

[14] *See* doc. no. 19, Exhibit H (Homeowner's Policy).

[15] *Id.*, Exhibit I (Deposition of Tom O'Connell), at 38.

[16] *Id.*, Exhibit J (Declarations Page of the Hopes' Homeowner's Policy).

[17] *Id.*

mailing address shown in the Declarations.  Proof of mailing will be sufficient proof of notice.

> a. When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.[18]

In early November of 2006, the Hopes received a statement from EMCASCO informing them that their first monthly premium payment in the amount of $82.92 (*i.e.*, $79.92 plus a $3.00 transaction charge) was due on or before November 11, 2006.[19]  The statement advised the Hopes to "[p]lease allow 5 days for payment to reach our office."[20]  The statement also included the following "Payment Reminders!":

○ You may pay the minimum due, entire account balance[,] or any amount in between.

○ If your payment is received after the 'Due Date' you may be subjected to a late fee of $10.00.  (This fee amount may vary based on applicable state law.)

○ Always pay at least the minimum due to avoid cancellation of coverage.

○ Transactions processed after the issue date of the invoice will be reflected on your next bill.

○ Payments will be applied to all policies in your account.

---

[18] *See id.*, Exhibit H, at 21.

[19] *See id.*, Exhibit K (November Statement).

[20] *Id.*

○    Refer to the back for more billing information.[21]

The reverse side of the statement also provided: "Any amount you pay that is greater than the minimum due will be applied as a credit on your next month's statement minimum due amount."[22]

The Hopes failed to pay the minimum premium amount due by November 11, 2006.  Consequently, on November 17, 2006, EMCASCO mailed the Hopes a "Notice of Cancellation" of the homeowner's insurance policy.[23]   The notice stated:

> NOTICE OF CANCELLATION-REASON:   NON-PAYMENT OF PREMIUM.  ISSUED 11/17/06.
>
> This policy will cease and terminate at 12:01 A.M. standard time on 11/29/06 at the address of the named insured as stated herein.  This is the only notice you will receive on this policy.
>
> The Cancellation Summary of your account includes the MINIMUM DUE in order to consider reinstatement of coverage.  Payment of less than this amount will not reinstate this policy.  Payments must be received before the due date.[24]

The "Cancellation Summary" referred to in the last paragraph of the foregoing notice stated that EMCASCO must receive the minimum amount of $172.84 before

---

[21]*Id.*

[22] *See* doc. no. 19, Exhibit K.

[23] *See id.*, Exhibit M (Notice of Cancellation).

[24] *Id.*

November 29, 2006 "for us to consider reinstatement of coverage."[25]  EMCASCO

calculated the amount of $172.84 by aggregating the following amounts: the

$82.92 payment due on November 11, 2006 (*i.e.*, $79.92 monthly premium plus

$3.00 transaction fee); a $10.00 late payment fee; and the $79.92 premium

installment due for the month of December 2006.[26]  EMCASCO submitted a

"Certificate of Mailing" from the United States Postal Service, confirming that it

mailed the "Notice of Cancellation" to the Hopes on November 17, 2006.[27]

On November 21, 2006, EMCASCO receipted a payment from the Hopes in

the amount of $99.17.[28]  Steve Hope testified that he mailed this payment to

EMCASCO on November 8 or 9, 2006, and explained that he wrote the check for

$99.17, "because the account balance was $799.17, and I was going to pay $99.17

to make it an even [$]100 for the next due date, December."[29]

The following day, November 22, 2006, EMCASCO mailed the Hopes a

second notice of cancellation.[30]  This notice stated that EMCASCO had deposited

---

[25] *Id.*

[26] *See* doc. no. 18, Statement of Undisputed Facts, ¶ 20.

[27] *See* doc. no. 19, Exhibit N (Certificate of Mailing).

[28] *Id.*, Exhibit L (The Hopes' Payment/Transfer History).

[29] *Id.*, Exhibit C (Deposition of Steve Hope), at 94-96.

[30] *Id.*, Statement of Undisputed Facts, ¶ 26.

the Hopes' payment of $99.17, and "applied it to the amount past due."[31]   The

notice further stated:

> The amount needed to bring your account up to date is $73.67 [*i.e.*,
> $172.84 (the amount stated in the first notice of cancellation) – $99.17
> paid by Steve Hope = $73.67 balance due for reinstatement].   This
> amount must be received in our office *before* 11/29/06 for
> reinstatement to be considered.   If the effective date of cancellation
> precedes this notice, contact your agent for replacement of coverage.
> This notice does not supersede any prior cancellation notice.[32]

EMCASCO has not submitted a "Certificate of Mailing" for the November 22,

2006 cancellation notice, and the Hopes assert that they never received the second

notice.[33]

The Hopes did not send EMCASCO any further payments before November

29, 2006.[34]   Consequently, at 12:01 a.m. on November 29, 2006, EMCASCO

canceled the Hopes' policy for non-payment of the premium.[35]   The subject

property was completely destroyed by a fire just five days later, on December 4,

2006.[36]   The Hopes filed an insurance claim with EMCASCO that same day.[37]

---

[31] *Id.*, Exhibit O (Second Notice of Cancellation).

[32] *See* doc. no. 19, Exhibit O (emphasis original).

[33] *Id.*, Exhibit C (Deposition of Steve Hope), at 99-100 and Exhibit D (Deposition of Kim Hope), at Exhibit D (Deposition of Kim Hope), at 50-51.

[34] *Id.*, Statement of Undisputed Facts, ¶ 27.

[35] *Id.*, Exhibit P (Cancellation Verification).

[36] *Id.*, Exhibit R (Speake Volunteer Fire Department Fire Report).

[37] *Id.*, Exhibit S (Property Loss Notice).

When an EMCASCO representative attempted to set up the Hopes' claim, the EMCASCO computer system indicated that their policy had been canceled on November 29, 2006, due to non-payment of the premium.[38]  Upon discovering the prior cancellation, Jewel Stubbs, a Claims Supervisor in EMCASCO's Birmingham office, consulted individuals in the company's underwriting and accounting departments and verified that the Hopes had failed to pay the full amount of their premium.[39]  Stubbs also contacted Jud Keel, who informed Stubbs that the Hopes had neither sent him a premium payment, nor contacted him regarding their premium obligations.[40]

Stubbs accordingly concluded that EMCASCO had properly canceled the Hopes' policy on November 29, 2006; and, on December 5, 2006, EMCASCO issued the Hopes a check in the amount of $39.00, to refund the portion of the $99.17 payment that exceeded the amount of money needed to provide coverage until the cancellation date of November 29, 2006.[41]  On December 16, 2006, Stubbs mailed a letter to the Hopes, informing them that they did not have a valid

---

[38] *See* doc. no. 19, Exhibit T (Affidavit of Jewel Stubbs), ¶ 4.

[39] *Id.*, Exhibit T (Affidavit of Jewel Stubbs), ¶ 5.

[40] *Id.*, ¶ 6.

[41] *Id.*, Exhibit T (Affidavit of Jewel Stubbs), ¶ 9 and Exhibit Q (Refund Check).

policy in force on the date of the loss and, as such, no payment would be made on their claim.[42]

The Hopes mailed a letter to EMCASCO on January 4, 2007, requesting the company to reconsider its refusal to pay their claim.[43]   In the process of reconsidering the Hopes' claim, Stubbs discovered information indicating that the Hopes did not have legal title to the subject property — either on the date the policy was issued, or at the time of their fire loss.[44]   Stubbs contacted officials in the Lawrence County courthouse, the county in which the subject property was located, and learned that the Hopes were not listed in property tax records.[45] Stubbs also contacted Traders and Farmers Bank and learned that it did not have any records indicating that the Hopes had acquired legal title to the subject property.[46]   Stubbs also ran a property search, which revealed that Samuel Vaughn was the owner of the subject property, and that Kerry Vaughn might be a co-owner.[47]

---

[42] *Id.*, Exhibit T (Affidavit of Jewel Stubbs), ¶ 10 and Exhibit V (Letter of December 14, 2006).

[43] *Id.*, Exhibit W (Letter of January 4, 2007).

[44] *See* doc. no. 19, Exhibit T (Affidavit of Jewel Stubbs), ¶ 13.

[45] *Id.*

[46] *Id.*

[47] *Id.*

Consequently, by means of a letter dated February 8, 2007, EMCASCO informed the Hopes that reconsideration of their claim had not altered the company's initial finding that their policy was properly canceled on November 29, 2006.[48]   The letter also stated that further investigation of their claim uncovered information indicating that the Hopes lacked an ownership interest in the subject property, and that, "if [the Hopes] did not have an ownership interest in the property, then the policy . . . would be void from inception."[49]   The letter requested the Hopes to send EMCASCO documentation of an ownership interest in the subject property between the dates of September 11 and November 29, 2006.[50]   The Hopes did not send any records indicating that they ever had an ownership interest in the subject property.[51]

On February 12, 2007, the Vaughns' force-placed homeowner's insurer paid $105,767.00 to the Vaughns and Traders and Farmers Bank for the loss of the subject property.[52]   These proceeds paid off the $101,105.13 balance remaining on the Vaughns' mortgages with Traders and Farmers Bank.[53]   Consequently, the Vaughns received a check in the amount of $4,661.87, the net insurance

---

[48]*Id.*, Exhibit X (Letter of February 8, 2007).

[49] *Id.*, ¶ 3.

[50] *See* doc. no. 19, Exhibit X, ¶ 3.

[51] *Id.*, Statement of Undisputed Facts, ¶ 51.

[52] *Id.*, Exhibit Y.

[53] *Id.*, Statement of Undisputed Facts, ¶ 53.

proceeds.[54]   The Hopes did not receive any money or credit in connection with the Vaughns' insurance proceeds.[55]

## III. DISCUSSION

The court first considers EMCASCO's motion for summary judgment on its declaratory judgment claim, because the Hopes' counterclaims for breach of contract and bad faith denial of coverage are dependent upon the existence of a valid policy of insurance on the date of loss. *See Southern Medical Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) ("In the ordinary breach of contract action, the claimant must prove: (1) the existence of a valid contract binding the parties in the action . . . ."); *Grimes v. Liberty Nat. Life Ins. Co.*, 551 So. 2d 329, 333 (Ala. 1989) ("It is axiomatic that a plaintiff alleging a bad faith refusal to pay on a contract of insurance must first show that there was an insurance contract in existence.")

EMCASCO's leading argument is that it is not obligated to indemnify the Hopes for their loss because it properly canceled their policy on November 29, 2006, prior to the fire that occurred on December 4, 2006, in accordance with the policy provision providing that, "[w]hen you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation

---

[54] *Id.*, Exhibit Y, at 2.

[55] *Id.*, Statement of Undisputed Facts, ¶ 55.

takes effect."[56]  EMCASCO asserts that the cancellation provision is valid because Alabama law is well settled that, "'in the absence of a restrictive statutory provision, the parties to an insurance contract may specify the method by which it may be canceled and the parties are thereby bound.  Put another way, an insurance policy may be canceled according to its terms.'"  *American Interstate Insurance Co. v. Kelley*, 797 So. 2d 479, 482 (Ala. Civ. App. 2000) (quoting *Mid-State Homes, Inc. v. Cherokee Insurance Co.*, 51 Ala. App. 247, 249, 284 So. 2d 274, 276 (1973)).

EMCASCO argues that, after the Hopes failed to pay the minimum amount due on the premium by the November 11, 2006 due date, it properly invoked the policy's cancellation provision and mailed the Hopes a cancellation notice on November 17, 2006.  EMCASCO further contends that the November 17, 2006 cancellation notice was consistent with the policy's cancellation provision because it gave the Hopes at least ten days notice of the cancellation at 12:01 a.m. on November 29, 2006.  EMCASCO also notes that the cancellation notice was sent to the Hopes *via* certified mail in accordance with the policy's provision that "proof of mailing will be sufficient proof of notice [of cancellation]."[57]

---

[56] *See* doc. no. 19, Exhibit H, at 21.

[57] *Id.*

The Hopes argue that there is a question of fact as to whether EMCASCO improperly conditioned prevention of the policy's cancellation and reinstatement of the policy upon the payment of $172.84 before November 29, 2006.  The Hopes specifically contend that EMCASCO had no contractual right to *accelerate* the December premium, due on December 11, 2006, to the cancellation date of November 29, 2006.  The Hopes assert that EMCASCO could have included language in the policy to provide for acceleration of the premium in situations of non-payment, but chose not to do so.  The court notes that EMCASCO did not require early payment of the December premium as a precondition to prevent cancellation of the policy.  Rather, the notice of cancellation dated November 17, 2006 informed the Hopes that the policy would be canceled on November 29, 2006, due to non-payment of the premium, and that payment of $172.84 was only a precondition for consideration of *reinstatement* of the policy.  Thus, EMCASCO did not improperly accelerate the Hopes' December premium in order to avoid cancellation of the policy.

EMCASCO contends the argument that it improperly conditioned *reinstatement* of the policy misinterprets its contractual responsibilities because, it says, it had no obligation, either statutory or contractual, to provide the Hopes the opportunity to reinstate their policy.  In the absence of such an obligation, EMCASCO asserts that it was fully entitled to condition *reinstatement* of the

Hopes' policy upon the payment of November's past-due premium *and*
December's as-yet-undue premium.   EMCASCO cites to the Couch treatise on
Insurance, which states that, "[i]n the absence of a statutory or contractual right to
reinstate a policy once it has lapsed for nonpayment of premiums, an insurer may
impose conditions for reinstatement in addition to repayment of continuance of
coverage."  2 L. Russ, *2 Couch on Insurance* § 33:46 (3d ed. 2005); *see also Scott
v. American Republic Life Ins. Co. of New York*, 88 A.D.2d 949 (N.Y.S.2d 1982).
The court finds that EMCASCO's offer of reinstatement of the policy was lawful.

        The Hopes also argue that EMCASCO's acceptance of their payment of
$99.17 on November 22, 2006 precluded EMCASCO from denying coverage for
the loss.   EMCASCO contends that this argument was rejected by the Alabama
Court of Civil Appeals in *Progressive Specialty Insurance Co. v. First Community
Bank*, 827 So. 2d 92 (Ala. Civ. App. 2000).   In that case, the insurer mailed the
insured a notice on November 6, 1996, stating that its policy would be canceled on
November 18, 1996, if $1,461.54 was not received by that date.  *Id*. at 93.   The
insured paid $730.77 on November 8, 1996, but failed to pay the remainder by
November 18, 1996, and the insurer accordingly canceled the policy that day.  *Id*.
On appeal, the Alabama Court of Civil Appeals addressed the question of "whether
[the insurer's] acceptance of the partial payment of the amount due under the
November premium notice and the refund of that premium after notice of the loss

amounted to a waiver of [the insured's] right to cancel the policy for nonpayment of premiums." *Id*. at 94. That Court held "that acceptance of the partial payment" did not "alter[] the requirement that the entire amount shown in the 'amount due' portion of the premium notice be paid before the cancellation date to avoid cancellation." *Id*. at 97. Based on the rationale of that court's decision in *Progressive*, this court finds that EMCASCO's acceptance of the Hopes' payment of $99.17 did not waive its right to cancel the Hopes' policy on November 29, 2006. EMCASCO accepted the partial payment on a date when the Hopes still had time to pay the remainder of the premium due, and it acted at all times in a manner consistent with its stated intention to cancel the Hopes' policy on November 29, 2006, and that it would consider reinstatement of the policy if the remainder of the premium due was paid.

The Hopes also argue that the policy's cancellation provisions are ambiguous and, as such, should be resolved in their favor. The Hopes suggest that the policy is ambiguous because neither the policy nor the statement for the November 11, 2006 premium specifies when a delinquent payment is considered a non-payment that generates cancellation of a policy. The Hopes assert that the statement for the November 11, 2006, premium ambiguously states that "[i]f your payment is received after the 'Due Date' you may be subjected to a late fee of $10.00" *and* "[a]lways pay at least the minimum due to avoid cancellation of

coverage."[58]   The Hopes note that their November payment of $99.17 was sufficient payment of the November premium because, they say, neither the policy nor the November billing statement provided a specific date by which a payment would be considered merely delinquent and subject only to a $10 late fee and that their payment of $99.17 is more than the aggregate of the $79.92 premium, the $3.00 monthly transaction charge, and the $10.00 late fee.   The Hopes argue that, as the insureds, the ambiguity in the policy must be construed in their favor and, therefore, a genuine issue of material fact exists as to whether EMCASCO properly canceled the policy.   *See Childress v. Foremost Ins. Co.*, 411 So. 2d 124 (Ala. 1982).

EMCASCO replies that the policy's provision stating that "[w]hen you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the cancellation takes effect" is unambiguous.   EMCASCO asserts that the Hopes were clearly on notice that their policy could be canceled "at any time" for non-payment of the premium.   The court agrees that the policy and statement for the premium due on November 11, 2006 are not ambiguous, in that, when a premium is not paid, EMCASCO may cancel the policy "at any time" by letting the insured know at least ten days before the date cancellation takes effect.   Because there is no evidence indicating that EMCASCO received the November premium

---

[58] *See* doc. no. 19, Exhibit L.

before November 17, 2006, the court can discern no genuine issue as to any material fact relevant to EMCASCO's cancellation of the Hopes' policy. Accordingly, EMCASCO properly canceled the Hopes' policy on November 29, 2006, due to non-payment of the premium.[59]   Because the policy was not in force and effect on the date of loss, the Hopes' counterclaims for breach of contract and bad faith necessarily fail.  *See Grimes*, 551 So. 2d at 332-33.

## IV. CONCLUSION

In accordance with the foregoing, EMCASCO's motion for summary judgment will be granted, and the Hopes motion for summary judgment will be denied.  An appropriate judgment will be entered contemporaneously herewith.

DONE this 30th day of September, 2008.

_____
United States District Judge

---

[59] Because EMCASCO properly canceled the Hopes' policy prior to their loss, the court need not address EMCASCO's argument that the Hopes cannot recover under the policy because, it says, the Hopes did not have an insurable interest in the subject property.